The court now calls case number 118749, People of the State of Illinois v. Jorge Guzman. The party is ready to proceed. Good morning, Your Honors. My name is Andy Boyd from the State Appellate Defender's Office. On behalf of the defendant, Jorge Guzman, if it pleases the court and counsel, the question presented in this case is whether a trial court's failure to advise a non-citizen defendant that he or she might be deported as a result of a guilty plea renders that plea constitutionally involuntary. As I'll explain today and as I've tried to explain in my briefs, the answer to that question is yes. The fundamental reason that the answer to that question is yes is because the United States Supreme Court in the Padilla case has clearly indicated that deportation can no longer be considered a collateral consequence of a criminal conviction. Instead, the Padilla court explained, deportation is a unique and a severe penalty that has become deeply enmeshed in the criminal proceedings. So what I'm therefore asking this honorable court to do is to hold that a trial court's failure to advise a non-citizen defendant of the potential immigration consequences of a guilty plea, which almost always includes deportation, and this is required by Illinois statute, renders that plea constitutionally involuntary and subject to withdrawal. In this case, Your Honor, Isn't it true, counsel, that the weight of authority has declined to apply Padilla in the Fifth Amendment context? Yes, Your Honor, and we certainly have to concede that, and we've done that in our briefs. And what I would respectfully explain, or at least try to explain, is that our belief is that what's happened, what these other courts have done, and the state's argument is skipping, we think, an essential logical step in the logical sequence here. What these courts have done, and the Illinois appellate court did this in Gutierrez, for example, and the New Hampshire Supreme Court did this, other federal courts have done this, is that they have taken a logical leap and simply stated that following Padilla, Padilla only addressed counsel's obligations to advise a non-citizen defendant. And the fundamental step that's being skipped here is that there's a fundamental point that the immigration consequences of a guilty plea are no longer collateral consequences. Following Padilla, that has to be clear. And if we take that as a foundational principle of law, which I think that we have to after Padilla, then it can't be the case that we simply skip to a point where we say that the trial courts have no due process obligations and Padilla doesn't extend to a trial court's obligations. So my answer to your question, Your Honor, is that what these other courts have done, in my humble opinion, is to skip an important logical step, and that's that there's a foundational principle of law at work here, and that's that deportation is not a collateral consequence of a guilty plea. Isn't the reason that the bulk of authority declined to apply Padilla to the Fifth is that the defense counsel is in a better position than the trial court to determine whether a defendant is a United States citizen and what the potential consequences to the defendant's immigration status might be? I think that what the Padilla court said, and the Padilla court did say that, yes, the defense counsel is in that position, and it's certainly arguable that defense counsel is in that position because defense counsel is the person that's communicating with the defendant. So I'll have to concede that, yes, defense counsel probably is in a better position, but what we're talking about here, again, is a foundational principle of law, a foundational principle of due process and fundamental fairness, and what we're asking is that this court find that, at least following Padilla, that deportation is not a collateral consequence. Your Honor, Mr. Guzman here was deportable.  When he was first under federal statutory law, the offense that he was convicted of was a deportable offense. There was no question that he was going to be deported. And as the Padilla court pointed out, after 1990, we have these significant changes in federal immigration law and the discretion that courts had and that the attorney general might have had prior to 1990, they don't have anymore. So when a defendant like Mr. Guzman is convicted of a deportable offense, when he pleads guilty to a deportable offense, he is going to be deported. It is virtually automatic. And as we're all well aware, by statute in Illinois, 725 ILCS 5-113-8, trial courts are required to advise all defendants, regardless of whether they're citizens, that if they plead guilty to an offense and they're not a citizen of the United States, that that defendant is likely to be deported. And this statute says that these courts shall give these defendants these admonishments. And here, what we have is a trial court that completely and utterly failed to give Mr. Guzman these admonishments. And we should be clear, the state refers several times in its briefs to what it calls imperfect admonishments. This is not a case where this court is called upon to decide something like whether a trial court substantially complied with the Supreme Court rule or substantially complied with the statute. The situation here is we have a trial court's complete and utter failure to advise a non-citizen defendant that he was going to be deported as a result of his guilty plea. So the question that we're faced with is, what consequences flow from the trial court's obvious failure here to advise Mr. Guzman that he was going to be subject to deportation as a result of his guilty plea? Now, to answer that, I do acknowledge that we have to go back to this court's fairly recent decision in DelValar. And what this court decided in DelValar, first of all, was that these Section 113A admonishments were mandatory. They were mandatory in the sense that under that statute, trial courts had a clear obligation to give non-citizen defendants, in fact, all defendants, that admonishment. Now, this court also decided, we have to acknowledge this, this court also decided that these admonishments were only directory in the sense that there were no specific consequences that would flow from a trial court's failure to give these admonishments. And this court also determined in DelVar, and this becomes very important, is that a trial court's failure to give these admonishments did not implicate the constitutional voluntariness of the guilty plea. So we would have to overrule DelVar. Essentially, yes, Your Honors. And I do realize and acknowledge that I'm asking quite a lot of this honorable court. But in my view, in our view, this honorable court is compelled to do this because of the Padilla decision. The essential problem with this court's holding in DelVar, and Justice Holdridge recognizes in his appellate court decision, the essential problem with this court's holding in DelVar is that it cannot survive, it simply cannot survive the DelVar court, excuse me, the Padilla court's declaration that immigration consequences can no longer be considered collateral consequences of a guilty plea. Counsel, following up on Chief Justice Garmon's question, is the legislature has not seen fit to amend that section subsequent to our DelVar decision. They've not. That's correct. And what we have here, I think, and I certainly can't speak to why this legislature has or has not done what they've done, but I think what we have here is a foundational new process and a foundational fundamental fairness question after Padilla. And it seems to me, and Justice Holdridge pointed this out again in his dissent, is that the very foundation of this honorable court's holding in DelVar was that immigration consequences were collateral consequences of a guilty plea. That can't be anymore after the Padilla decision. That simply cannot stand with all due respect to this honorable court. That has to change. And in Padilla, we see the court talking about things like how deportation is a drastic measure for a vast number of noncitizen defendants. And the Padilla court went on to very clearly explain that the idea that there's a distinction between direct and collateral consequences of a guilty plea, that distinction doesn't make sense anymore in the context of a defendant's potential deportation. And the Padilla court also recognized, and this I think is absolutely crucial, the Padilla court recognized that deportation is a particularly severe penalty. It's a penalty of a criminal conviction. Now, is it in a strict sense a criminal sanction? No, it's not. The Padilla court recognized that. But it is a particularly severe penalty that's deeply tied up and deeply enmeshed with the criminal process. And it's virtually impossible at this point to say that deportation is a collateral consequence. Yes, Your Honor, the legislature after DelVar has not amended that statute, but the fundamental problem with this DelVar decision is that the very foundation to the DelVar decision is simply not there anymore after Padilla. Much of our prior case law on the distinction between direct and collateral consequences focuses on which sovereign is imposing the consequences. You seem to be arguing, and your brief seems to be arguing, that you're reading Padilla to focus on the certainty of the consequences. My question to you is, is there a difference? We do talk about the certainty of the consequence. We also talk about the severity of the consequence. And we also talk about the automatic nature of the consequence. So those are, and I hope this answers your question, Your Honor, but those are the things that we're focusing on is that deportation, the Padilla court recognizes deportation is unique. It's severe. It takes people away from their families and their communities and their homes and their jobs, and it deposits them in a foreign country. And it's virtually impossible for folks to get back to this country lawfully at any rate after they've been deported due to a criminal sanction. So this is something that's a very severe penalty. It's automatic, and it's mandatory. So, of course, I guess by your argument, it doesn't make any difference. That's not something the court's imposing. That's something the federal system does. Is that right? Yes. We have no control over that, whether they do or whether they don't deport somebody. And that clearly is the case. That clearly is the case. And that's the traditional definition of what a collateral consequence is. But after Padilla, with all due respect to this honorable court, to categorize deportation as a collateral consequence simply doesn't work anymore after Padilla. Deportation is something that's unique. It's not a direct consequence. Clearly you're right, Your Honor. Trial courts, appellate courts, this honorable court can't order a defendant to be deported. So it's not a direct consequence. But it's also not a collateral consequence either. It's something that's unique. Sui generis, perhaps, is the word for it. It's something that is in a category of its own, and it can no longer be considered a collateral consequence. Now, when we go all the way back to Boykin v. Alabama, Supreme Court of the United States, 1969, it's clear that in order for a guilty plea to be valid under the Due Process Clause, the record has to affirmatively show that the plea was entered intelligently and with full knowledge of all the consequences. Now, what the Boykin Court recognized was that when people plead guilty, they give up a number of valuable rights. For example, the right to confront one's accusers, the right to a trial by jury, things like that. And following Padilla, we can add one more extraordinarily important right, the right of a non-citizen defendant to reside in the United States, to live with his family, to work at his job, to live in his community. And so we are asking this honorable court to hold that one of the consequences that has to be explained by a court as a matter of fundamental due process, as a matter of fundamental fairness, is that if a defendant pleads guilty to a certain offense, that he is almost certainly going to be deported. Now, as I said before, and I'd like to reemphasize this, there's a straightforward logical progression here, and with all due respect to these other courts, that the state decided, and we do have to admit that the weight of the authority, unfortunately for us, does seem to be going in the other direction. But with all due respect to those other courts, in my humble opinion, there's a logical problem. These courts are taking a logical leap that's unwarranted, and we have to start with the foundational principle that the immigration consequences of a guilty plea deportation is no longer a collateral consequence. And if we recognize that, and we also recognize that it's not a direct consequence, which we have to concede, the question then becomes, well, what is deportation? What is the nature of deportation as a consequence of a guilty plea? Well, if it's not a direct consequence, if it's not a collateral consequence, it has to be something different. It has to be something special. It has to be something unique. And that's what the Padilla Court said. Deportation is unique, and it is severe. The Padilla Court said this. The Chavez Court reaffirmed this. So I want to make this clear, your honors. I'm not standing here arguing that this honorable court should recategorize deportation as a direct consequence of a guilty plea. That's not the argument here. What we're arguing is that deportation is not a direct consequence. It's not a collateral consequence. It's something different. It's something unique. And this next logical point here becomes very crucial. This principle is not context-specific. If it's the case that deportation is not a collateral consequence of a guilty plea, as a matter of law, then it has to be true for all purposes, as Justice Holdridge pointed out in his dissent in this case. It cannot be the case that we are going to split and we're going to say, well, in one context this is a collateral consequence and in another consequence it simply does not make logical sense. So what we have is a foundational principle of law that deportation is not a collateral consequence. It's special. It's unique. It's severe. It's automatic, and it's mandatory. For a guilty plea to be valid under the Due Process Clause, the record then is going to have to show that the plea was entered intelligently with full knowledge of all the consequences, all the potential consequences of the guilty plea, and that includes deportation, and that's why. And this is the end to our logical progression here. A trial court's failure to give a defendant, a non-citizen defendant, to Section 113A of the Admonishments is a denial of due process. Now, New York's highest court, in Peck, and this is the case I'd like to direct this Honorable Court's attention to, did hold that the Padilla Court's factual observation about the nature of deportation rings true in both the context of due process and the effective assistance of counsel context. And the Peck Court acknowledged that there's a difficulty of categorizing deportation, and the Peck Court went on to say that deportation constitutes such a substantial and such a unique consequence of a guilty plea that it has to be mentioned by a trial court as a matter of fundamental fairness. I'd also like to direct this Honorable Court's attention, and I've done this in my briefs, to the New York Court Chief Justice Litman's dissent. He has some very good language, and I think in there, about how deportation is uniquely difficult to classify as either a direct or a collateral consequence. It has to be the case for all purposes. We cannot say as a matter of fundamental logic that, well, deportation is a collateral consequence for one purpose or not. If it's not a collateral consequence, it's not a collateral consequence. Now, what I'd like to do, I see I'm very close to the end. I think what I should do, Your Honors, at this point very quickly, is to address this Court's decision in the Hughes case. The State talks about this, and I talked about this a little bit in my brief. We have to acknowledge that in the Hughes case, which dealt with sexual offenses, that this Court found that there wasn't any due process obligation when the trial court failed to inform the defendant that he might be civilly committed as a result of his guilty plea. Now, the difference between that context and this context is that the Hughes Court, this Honorable Court in Hughes, decided that the possibility of involuntary commitment, it was not immediate, it was not automatic, it was not mandatory in the same sense that deportation is. So what we've got is this Honorable Court recognizing in Hughes that deportation is unique, it's different, it's special, it's severe, it's automatic. And we're asking this Court, as a matter of law, to hold that a trial court's failure to advise a non-citizen defendant of the potential immigration consequences of his guilty plea, as required by Illinois statute, renders that plea constitutionally involuntary and subject to withdrawal. And we'd also like this Honorable Court, respectfully, to reverse the appellate court decision in Mr. Guzman's direct appeal and remand the case so that he can withdraw his guilty plea. I'll be happy to answer any other questions this Court might have. I don't think there are any more questions, Mr. Boyd. Thank you. May it please the Court, Counsel, I am Assistant Attorney General Lindsay Payne on behalf of the people of the State of Illinois. I think it's important to take a step back and look at the context of defendant's claim here. Defendant is here on direct appeal. He currently has a post-conviction petition pending in the Circuit Court of Will County where he has alleged a Sixth Amendment violation under Padilla. In that case, he will have the opportunity to demonstrate that he was unaware of the immigration consequences of his plea and that had he known he risked removal from the country, he would not have pled guilty to aggravated possession of stolen firearms. Under Padilla, he will be entitled to relief in that case if he can demonstrate that there's a reasonable probability that he would not have pled guilty had Counsel warned him of the immigration consequences. Additionally, although he did not raise the claim in this Court, defendant had a remedy available under this Court's decision in DelVillar. Had he alleged and proven that there was a reasonable probability that he would not have pled guilty had the trial court given the Section 113-8 admonishment, then he would have been entitled to withdraw his plea under DelVillar. Defendant simply raises the wrong claim before this Court. He asks for more protection than that which is given to defendants who have been misinformed regarding the direct consequences of their pleas. He asks this Court to go beyond what any court in this country has done and to hold that a trial court's admonishment error entitles him to automatic withdrawal of his plea without any demonstration of prejudice. That's something that is not even allowed if the trial court tells the defendant the wrong maximum penalty for his crime. This would be a truly unprecedented rule. Padilla struck the right balance, as this Court acknowledged, by placing the responsibility of warning defendant with defense counsel, who is in a far better position than the trial court, to understand her client's needs and to advise them on the advantages and disadvantages of a guilty plea, including any potential immigration consequences. Trial courts are required to warn defendants only of the direct consequences of their pleas for good reason. Direct consequences are those consequences that are at the core of the trial court's duties and represent the universe of what is within the trial court's control. And as Chief Justice Garmon was noting, the question is not certainty and the question is not severity, as my opponent would suggest. The question is, does the trial court have the ability to impose removal from the country on the defendant as a punishment for the crime? And it is not within the trial court's control. Defendant would expand the obligations on the trial court and place them in the position, the burdensome position, of determining who is and who is not a United States citizen. And it's worth noting that in defendant's reply brief at page 11, he argues that trial courts would not be tasked with sorting out who is and who is not a United States citizen because it would be defendant's burden to put forth evidence proving that he's not a United States citizen at the hearing on his motion to withdraw his guilty plea. But defendant here never put forth any such evidence. He's never done anything more than allege that the trial court failed to give the statutory admonishment and that he's therefore automatically entitled to withdraw his plea. So even under defendant's own proposed rule, he fails to meet his burden here. But this court should not adopt defendant's rule, which falls far short of this court's decision in DelVillar. He's not demonstrated good cause for this court to depart from DelVillar, so this court should not create a new rule that would burden trial courts and undermine the finality of judgments. Defendant argues here today that Padilla compels this court to overturn DelVillar. But defendant's claim for relief relies upon a misreading of Padilla's holding. First, Padilla's holding was simply that collateral consequences are not categorically exempt from counsel's duty to her client under the Sixth Amendment. So any position that Padilla may have taken on whether immigration consequences are collateral for Fifth Amendment purposes would have been mute dicta. But secondly, Padilla took no position on whether immigration consequences are collateral. The strongest statement that Padilla made on the subject was that immigration consequences are uniquely difficult to categorize as either direct or collateral. And this court, in People v. Carrera, recognized that that was not a repudiation of immigration consequences as collateral consequences. As this court put it, Padilla merely declined to classify deportation as either a direct or a collateral consequence. Thus, under this court's own interpretation of Padilla, Padilla did not overturn DelVillar, and it has no bearing on this court's established Fifth Amendment jurisprudence. But even if, as defendant argues, Padilla created a third class of consequences, consequences that are neither direct nor collateral, defendants still would not be entitled to relief. And that's because under United States v. Brady, due process only requires trial courts to admonish defendants on the direct consequences of their pleas. Defendant does not allege that after Padilla, immigration consequences are direct consequences. Therefore, he's not stated a due process claim because it's not enough for a consequence to be categorized as merely not collateral. That consequence has to be affirmatively categorized as direct for an admonishment from the trial court to be constitutionally required. In the absence of any binding change from Padilla, this court's decision in DelVillar controls. And under DelVillar, the trial court's failure to admonish regarding immigration consequences does not rise to the level of a due process violation. And tellingly, defendant here never conducts a due process analysis. Before this court can recognize a new due process right, it should weigh the nature of the private interest at stake and the value of the additional safeguard against the adverse impact of the requirement upon the government's interests. Here, because there are already remedies available to defendants under both Padilla and DelVillar, if the defendant can demonstrate prejudice, the interest at stake is just the interest in withdrawing one's guilty plea without demonstrating prejudice. And the value of the safeguard is minimal if it's only protecting defendants who have not been prejudiced. That minimal value must be weighed against the government's recognized and legitimate interest in the finality of convictions, bearing in mind that approximately 95% of all convictions result from guilty pleas. So neither Padilla nor a due process analysis starting from first principles compel this court to overturn DelVillar, and this court should decline to do so. I would like to take a moment to provide some clarification on the record, if I could. There had been a representation made in the appellate court that the defendant had been removed from the country, and that is true, but a lot has changed since then. The defendant was removed from the country in 2010. He then illegally re-entered in 2012 and was re-removed. He illegally re-entered again and was convicted of illegal re-entry. He was again removed. He again re-entered the country, and since that time, he was convicted of a drug crime, and he is currently imprisoned at the Illinois River Correctional Center. He's due to complete a one-year sentence next month, at which time he will be released on MSR, but he will be released back to the custody of Immigrations and Customs Enforcement. So for now, he is in the country, but it does not appear that he will be for long. If the court has no questions, we would ask that the court affirm the judgment below. Thank you. Your Honors, the first thing I'd like to point out here, regarding Mr. Guzman's current whereabouts, the last thing in the world I would ever want to do is to deceive this Honorable Court about anything. I found out myself on Friday that Mr. Guzman had re-entered this country and was incarcerated at the Illinois Valley Correctional Department, and counsel is certainly correct about that. And the thing that I would point out very briefly about that is that whether or not Mr. Guzman did or did not re-enter this country illegally, whether he committed another crime or not after that is something that is outside of the record in this case. And as an Honorable Court, it's fairly clear in the law that this Honorable Court is not supposed to be talking about, excuse me, considering things that are outside of the record. So while counsel is correct about what happened, and I do concede that she is correct, this Honorable Court should not consider these matters when it decides this is the case. Now, I'd like to talk about a couple of things that the counsel spoke about. The first thing the counsel spoke about is the issue of prejudice. And the Peck Court talked about that in particular. Chief Justice Lipton's dissent in the Peck decision talked a little bit about the prejudice issue. And what Chief Justice Lipton said, I think, was very powerful and was directly on point. If there's been a due process violation, and we argue that there was one here, a fundamental violation of Mr. Guzman's due process rights, it's improper to then place the burden on the defendant. It's improper then to place the burden on Mr. Guzman to go ahead and show that the due process violation was not harmless. Due process violations, by their very nature, are presumptively prejudicial. That's why we call them due process violations. That's why they are categorized as due process violations is because they are presumptively prejudicial. And what Justice Lipton also pointed out was that if there's a prejudice component added to the requirements here for the withdrawal of a guilty plea, what we have is a context that's almost identical to the ineffective assistance of counsel context. And it's clear that we're talking about a very different thing here when we're talking about trial court's obligations to inform defendants of the consequences of a guilty plea. So the prejudice argument, Your Honors, in response to that, what we have got here is an issue of fundamental fairness. When an individual like Mr. Guzman stands before a trial court and pleads guilty to an offense, some very, very serious things are going to happen to that person. And the first thing that's going to happen to that person is that that person is almost certainly going to be in prison for a period of time. And the second thing that's going to happen to that person, if that person is not a citizen like Mr. Guzman was not, is that person is going to be forcibly removed from their home, forcibly removed from their communities, forcibly removed from their jobs, and deposited in a foreign country with virtually no hope of ever returning lawfully to the United States ever again. Now, one of the other things that counsel talked about, and I want to talk about this very briefly, is the idea that there would be some sort of added burden on the trial courts here. Now, the first response to make to that is that there is no added burden whatsoever on the trial court here during the guilty plea colloquy. Section 113-8 requires the trial courts to admonish defendants, all defendants, and this round of the court explained that very clearly in Delvillar, regardless of whether or not they're citizens or not, to admonish all defendants that if they're not a citizen, they may be deported as a result of the guilty plea. So there would be no added burden whatsoever on trial courts at the guilty plea stage. Just recite the admonishments. That's what the statute requires. Now, at the motion to withdraw a guilty plea stage, we do concede that the trial courts would be in a position of having to determine who's a citizen and who's not. But the burden's not on the trial court at that point. The burden's on the movement. And this is simple elementary law. The moving party bears the burden of proving facts and material to the motion. And the moving party, in this case the defendant, would have to be able to show the trial court all the material facts relevant to the motion. One of those material facts would be that this person is not a citizen. And so it would be the defendant's burden to show clearly to the trial court that he or she was not a citizen. And if this person couldn't do that, then the motion would be denied. And the court would be in no more burdensome position than it is when any other motion is presented to it. The court would presumably order the issue briefed, read the briefs, listen to the oral arguments, and then render a decision. It's the same burden the trial courts have when they're presented with any other motion. So there simply is no added burden here, Your Honor. One of the other things the State talked about, and I'd like to talk about this briefly, the State argues that the defendant is asking this court to essentially break brand new ground here in fashioning a new rule. And we have to concede that, yes, no courts have done what we're respectfully asking for this honorable court to do. The Peck Court came close. The Peck Court came close. They decided as a matter of fundamental fairness the trial courts were required as a matter of fundamental due process to give the defendants the admonishments. However, the Peck Court also went on to say that there had to be an element of prejudice. So the Peck Court is close to what we're asking this court to do. But the thing that I'd like to point out, Your Honors, is that any time there's a significant break in the law, any time something new happens in the law, somebody has to be first. Somebody has to take the bold step of being first and saying, look, whatever this is, whether we go back to something like Brown v. Board of Education, this is a matter of fundamental fairness, it's a matter of due process, it's a matter of people's rights, and we are going to be the first person. And what we're asking this court to do, and what a wonderful opportunity this court has to be the first court to go ahead and say that this is a matter of fundamental due process, this is a matter of fundamental fairness. And this honorable court can and should, I would respectfully submit, take that step. The last thing I'd like to point out, Your Honors, and I can see that I'm running out of time, the Padilla Court. Counsel, you're right, I guess, the deportations that occurred afterwards, I mean, they're not of record, but out of curiosity, was there any deportation prior to this case, prior to the guilty plea in this case? To my knowledge, Your Honor, no. Mr. Guzman was a lawful permanent resident, he was arrested on this offense, he pled guilty, and deportation proceedings began at that point. If there was, would that make a difference to your argument, that a defendant had actual knowledge that he could be deported because he was deported previously? That's a fair question, Your Honor, one I honestly had not anticipated. I don't think so. In my view, what we have here is a matter of foundational, fundamental fairness, a matter of fundamental due process. When an individual like Mr. Guzman pleads guilty, two very important things are going to happen. He's going to be incarcerated, and then he's going to be forcibly removed from this country, and he will not be able to lawfully return to this country. And so as a matter of fundamental fairness, even if he was aware of this, even if he had been aware of this when he walked into that courtroom, as a matter of fundamental fairness. So prejudice plays no role in the analysis at all, as far as you're concerned? I didn't catch your question. Prejudice plays absolutely no concern. No, no, no. And I recognize that that's asking this Court to take a big step, I do recognize that. I would direct this Honorable Court to Justice Litman's powerful, what I find to be very powerful, dissent in the Peck decision, explaining why prejudice should not play into this. And the fundamental idea here is that we are talking about fundamental matters of due process, fundamental matters of fairness. And a trial court is going to put a position, a defendant in a position of, number one, being incarcerated for a substantial amount of time, and, number two, then being subject to almost certain deportation. And this deportation for a criminal conviction is essentially permanent. I've done some research on it. I can't quote the statutes off the top of my head, but my research indicates that when a defendant is deported as a result of a criminal conviction, it's extraordinarily difficult, if not impossible, to ever return to this country illegally. So, Your Honors, what I'd like to conclude very briefly, just by asking this Court to reverse the appellate court's decision. Is that belied by what's not a record in this case, that he returned three or four times after being deported? Yes. And I'm frankly, Your Honor, not sure how to respond to that. It's unfortunate that this happened, and there's really nothing else. But you're saying that is nowhere near the norm. You're saying once they're deported, very difficult to get back. It's very difficult for these people to get back lawfully. It's virtually impossible for these people to get back lawfully. Whether or not these people are able to get back to this country by other means, that's not something I'm all that eager to get into at this point in time. We respectfully ask this Court to reverse the appellate court and Mr. Guzman's direct appeal. Thank you for your time, Your Honors. Thank you. Case number 118749, People of the State of Illinois v. Jorge Guzman, will be taken under advisement by the Court as Agenda Number 15. Mr. Boyd and Ms. Payne, we thank you for your arguments today and assure you the Court will decide this matter on matters of record and not outside the record. Thank you.